

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

**DAVID W. HERCHER**
BANKRUPTCY JUDGE

1001 S.W. FIFTH AVENUE, # 700
PORTLAND, OREGON 97204
(503) 326-1538

COLLIN M. COLE
LAW CLERK
DORIA D. ARNTSEN
JUDICIAL ASSISTANT

October 18, 2018

NOT FOR PUBLICATION

Marc Hull
via ECF only

Michael Fuller
via ECF only

Subject:  In re Antoinette Michelle Maxwell
Case No. 17-32084-dwh7
State of Oregon v. Antoinette Michelle Maxwell
Adversary Proceeding No. 17-03113-dwh

Greetings:

I will enter judgment in this action for plaintiff, the State of Oregon, Department of Human Services, determining that the state's claim against defendant, Antoinette Michelle Maxwell, is nondischargeable. This letter constitutes my findings of fact and conclusions of law.

## I.     The complaint

Maxwell filed her chapter 7 petition on June 1, 2017. The state filed this action on August 30, 2017.

The state alleges that she obtained food stamps and public-assistance benefits through the Temporary Assistance for Needy Families and Employment Related Day Care programs by making false representations. Specifically, it alleges that (1) she had a duty to report her earnings and her receipt of child-support payments; (2) she failed to report her earnings from employment with Martin Meaux; (3) she failed to report that she received child support; (4) the representations were material; (5) she made the representations with the intent to deceive the state in order to receive benefits; (6) the state provided her with $8,813 of food stamps to which she wasn't entitled, of which it has recovered $4,173, $2,741.82 in TANF benefits, none of which has been recovered, and $8,834.60 in ERDC benefits, none of which has been recovered; (7) the state provided these benefits in reliance on her representations; and (8) the balance owing is $16,288.42.

## II.     Motion to amend witness list

On June 11, 2018, the Monday before the trial held on Thursday, June 14, the state filed its Motion to Amend Witness List,[1] seeking to substitute Marisol Carter for Erica Silberman as the state's trial witness due to a family emergency preventing Silberman from attending the trial. At the trial, the state's lawyer said that he learned of Silberman's family emergency two or three days before trial.[2] According to the motion, Mses. Carter and Silberman hold the same position with the state and had access to the same underlying documents, which were the subject of Carter's testimony.

At the beginning of the trial, Maxwell's lawyer objected to the motion on the ground that he had done research on Silberman "last night" (Wednesday, June 13) and thus would be prejudiced by the substitution.[3] Because Maxwell's lawyer received the motion by electronic transmission when it was filed on June 11 and undertook research on Silberman on June 13, and because Maxwell didn't identify during the trial any other, more specific prejudice from the substitution, I find that the substitution didn't prejudice Maxwell, and I will grant the motion.

## III.    Findings and conclusions

### A.     *Jurisdiction and constitutional authority*

Because this action arises under title 11 of the U.S. Code, the district court of this district has original jurisdiction over this action.[4] By local rule, the district court has referred this and similar actions to this court.[5] This action is a core proceeding,[6] which this court may hear and determine and in which it may enter appropriate orders and judgments.[7]

The state has expressly consented to this court's entry of final orders or judgments. Although Maxwell's answer failed to address that issue,[8] she has raised no objection to entry of final orders or judgments by this court. This action is one in which a bankruptcy court may enter final orders and judgments consistent with Article III of the Constitution. But even if it weren't, by her silence she has consented.[9]

### B.     *Legal standards*

Section 523(a)(2) of title 11 excepts from discharge two kinds of debts for money, property, services, or an extension or renewal of credit: (1) those where the money or property was obtained by false pretenses, a false representation, or actual fraud (under

---

[1] Docket item 32.
[2] Trial (Tr.) Transcript [43] at 5:25 - 6:1.
[3] Tr. Transcript at 4:6-10.
[4] 28 U.S.C. § 1334(b).
[5] 28 U.S.C. § 157(a); LR 2100-1.
[6] 28 U.S.C. § 157(b)(2)(I).
[7] 28 U.S.C. § 157(b)(1).
[8] Fed. R. Bankr. P. 7012(b); LBR 7012-1.
[9] *Wellness Intern. Network, Ltd. v. Sharif*, 135 S.Ct. 1932, (U.S. 2014) (consent to entry of bankruptcy court adjudication of *Stern* action); LBR 7012-1.

section 523(a)(2)(A)) and (2) for which the money or property was obtained by use of a materially false written statement respecting the debtor's financial condition, on which the creditor reasonably relied (under section 523(a)(2)(B)). In the complaint, the state invokes section 523(a)(2), but the state doesn't specify whether it relies on subparagraph (A) or (B). In the state's posttrial brief, it relies on both subparagraphs.[10]

There are two differences between these categories that are significant when a creditor seeks to prove an exception to discharge based on misrepresentations. First, section 523(a)(2)(A) expressly excludes statements respecting the debtor's financial condition. So, if a creditor is relying on a statement respecting the debtor's financial condition, the statement must be in writing to support an exception to discharge.

Second, the level of required reliance varies between the categories. Section 523(a)(2)(A) (statements unrelated to financial condition) requires only justifiable reliance.[11] But section 523(a)(2)(B) (statements respecting the debtor's financial condition) requires reasonable reliance, which is a more demanding standard. A statement needn't convey (or purport to convey) a complete picture of the debtor's financial condition to fall into the second category.[12] Instead, any statement that "has a direct relation to or impact on a debtor's overall financial status" is a statement respecting the debtor's financial condition.[13]

Because the misrepresentations on which the state relies—nondisclosure of some of Maxwell's sources of income—have a direct relation to and thus "respect" her overall financial status, the applicable subsection is section 523(a)(2)(B), and not section 523(a)(2)(A).

That the state alleges omissions, rather than affirmative misrepresentations, raises a possible, but surmountable, interpretive difficulty. In the state's argument that section 523(a)(2)(A) applies to omissions and thus is an independent basis for nondischargeability, it fails to distinguish between two distinct types of potentially nondischargeable omissions. The first type of omission, addressed by section 523(a)(2)(A), is a debtor's failure to disclose a fact when under a legal obligation to do so[14]—but only if the fraud or false representation is not "respecting" the debtor's financial condition. For example, in the Ninth Circuit's 1996 decision in *In re Apte*[15] (cited by the state), the debtor-sublessor fraudulently failed to disclose to a potential sublessee that the debtor had failed to satisfy a condition of the sublease that the master lessor consent to the sublease. The creditor and the court of appeals considered only section 523(a)(2)(A), presumably because the misrepresentation was not respecting the debtor's financial condition. It was thus unnecessary that the misrepresentation be in writing. The second type of omission, addressed by section 523(a)(2)(B),

---

[10] Docket item 50.

[11] *Field v. Mans*, 516 U.S. 59, 74-75 (1995).

[12] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 2018 WL 2465174, at *7 (U.S. June 4, 2018).

[13] *Id.*

[14] *In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000) (creditor must prove "misrepresentation, fraudulent omission or deceptive conduct"); *In re Davis*, 486 B.R. 182, 191 (Bankr. N.D. Cal. 2013) (collecting cases) (intentionally deceptive omission can support finding of fraud).

[15] 96 F.3d 1319 (9th Cir. 1996).

is a debtor's omission from a writing respecting the debtor's financial condition of material information.

Here, Maxwell's alleged omissions were of the second type. The applications were in writing and respecting her financial condition, and she allegedly omitted reportable earned wage income and child support. Thus, the nondischargeability of the state's claim against her—even though based on omissions—can be based only on section 523(a)(2)(B).

I needn't decide the more challenging question whether a debtor's total silence, when under a legal obligation to disclose facts respecting the debtor's financial condition, could create a nondischargeable debt despite the absence of any writing.

Having concluded that the alleged statements at issue were respecting Maxwell's financial condition, I conclude that the state must prove the following elements to except the debt from discharge: (1) by making the benefits applications at issue, she made a written statement respecting her financial condition; (2) the statement was materially false; (3) she then knew that the representation was false; (4) she intended to deceive the state; (5) the state relied on the representations; (6) the state's reliance was reasonable; and (7) damages proximately resulted from the representations.[16]

### C.     The state has proved the elements of section 523(a)(2)(B) nondischargeability.

#### 1.     The written applications were respecting Maxwell's financial condition.

The applications constituted written statements respecting Maxwell's financial condition.

#### 2.     The statements were materially false.

Her representations were made in 10 benefits applications. In six of the applications dated January 13,[17] April 3,[18] and December 10, 2009,[19] September 23, 2010,[20] January 7, 2011,[21] and January 10, 2013,[22] paragraphs 2 and 3 on page 3 required her to list each current employer and the amounts of earned and unearned income received "This Month," "Last Month," Two Months Ago," and "Three Months Ago." The paragraph 4 instructions state that unearned income includes "child support." In each of those applications, she failed to report that she had received

---

[16] *In re Siriani*, 967 F.2d 302, 304 (9th Cir. 1992).
[17] Tr. Ex. 1 at 1.
[18] Tr. Ex. 1 at 16.
[19] Tr. Ex. 1 at 31.
[20] Tr. Ex. 1 at 52.
[21] Tr. Ex. 1 at 67.
[22] Tr. Ex. 1 at 99.

reportable earned income from Meaux,[23] and in several of them she failed to report that she had received reportable child-support income.[24]

In two interim change reports for SNAP and ERDC benefits dated June 30, 2010,[25] and June 25, 2012,[26] paragraph 4 on page 4 required Maxwell to list work income, but she failed to report that she worked for Meaux during those months.[27] Also, paragraph 3 on page 3 required that she disclose child-support income, and she failed to list in the June 2010 report child-support income she received that month.[28]

In an ERDC re-application dated December 29, 2011, paragraph 5 on page 2 required Maxwell to list each employer.[29] And in an Oregon Health Plan and Healthy Kids application of the same date, part 7 on page 5 required that she list job income for the current month.[30] But in both she failed to report that she worked for Meaux that month.[31]

Maxwell testified that she didn't recall whether she received child-support payments in 2009 and 2010, but she recalled receiving none in 2011 through 2013.[32] The most recent month in which the state claims that she received a child-support payment that was reported is June 2010, when the state claim that she failed to report $158 in unearned income, resulting in a $202 SNAP overpayment that month.[33] I thus needn't address whether she did in fact receive child support after 2010. Comparing the state's documentary evidence of child support in 2009 and 2010 to her lack of recollection of receipt of child support for that period, I credit the state's evidence and find that she did receive the child support alleged by the state.

### 3. She knew that the representations were false.

I was not persuaded by Maxwell's testimony that she forgot her Meaux income each of the ten times she omitted it from an application;[34] that she received letters from the state saying that she needn't report that income;[35] or that she didn't think that she had to report her child-support payments because they were from the father of her daughter, but she was receiving ERDC benefits for a different child.[36]

I was also not persuaded by her argument, implicit in her statement that the Meaux payments were "small,"[37] that they were forgettable or immaterial. The net amounts of her

---

[23] Tr. Ex. 8.
[24] Tr. Ex. 10.
[25] Tr. Ex. 1 at 46.
[26] Tr. Ex. 1 at 95.
[27] Tr. Ex. 8 at 16, 42.
[28] Tr. Ex. 10 at 1.
[29] Tr. Ex. 1 at 82.
[30] Tr. Ex. 1 at 88.
[31] Tr. Ex. 8 at 35.
[32] Tr. Transcript at 97:21-25 - 98:1-5, 21-25.
[33] Tr. Ex. 4 at 38-39.
[34] Tr. Transcript at 90:10-14, 94:12-18, 95:17-18, 96:1-11.
[35] Tr. Transcript at 90:20-25 - 91:1-2, 94:19-21, 96:1-11.
[36] Tr. Transcript at 100:14-19.
[37] Tr. Transcript at 95:19-21, 22-25 - 96:1.

monthly Meaux income ranged from $134.28 for October 2009[38] to $626.65 for October 2012.[39] And during the period at issue (January 2009 through October 2013), she worked for Meaux during 49 of 58 months and omitted the Meaux income from all 10 applications.[40]

Finally, I wasn't persuaded by her testimony that she "didn't really read the applications."[41] She didn't testify to any difficulty reading, and she did properly—but incompletely—complete blanks in many of the applications disclosing her primary employer. Her failure also to disclose her secondary employment with Meaux thus couldn't have resulted from a failure to read the applications.

I find that she knew that she was receiving or had previously received income that she was required to, but didn't, disclose on each of the applications.

### 4.      She intended to deceive the state.

Even if a defendant in a section 523(a)(2)(B) action denies intent to deceive the plaintiff, the debtor's intent may be established by showing by a preponderance of the evidence that the debtor's false written statement was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently.[42]

Here, Maxwell made a series of materially affirmative false statements to the state in applications for public assistance. Each application included the statement above the signature line that "by signing below I agree that I have given DHS true, correct, and complete information." I find that she either knew that she had omitted material information from the applications or acted so recklessly as to warrant a finding that she acted fraudulently. I thus find that she intended to deceive the state.

### 5.      The state relied on the representations.

As a result of the false applications, the state provided financial benefits to Maxwell. I heard testimony, albeit somewhat general, that the state relied on the applications in providing benefits to her.[43] That testimony adds support to what would have been a logical inference anyway: that the state wouldn't provide benefits in the absence of an application from an apparently eligible person. That the state provided benefits to her demonstrates that it relied on the statements in her applications. I don't agree with her argument that, to prove reliance, the state must reconstruct her applications by adding information that should have been included and then calculating the benefits that would have been paid under the corrected applications. I also don't agree that the state's access to a database with information about her employers, which it apparently used in investigating her, excuses her from truthfully answering application questions

---

38 Tr. Ex. 8 at 10.
39 Tr. Ex. 8 at 47.
40 Tr. Exs. 1, 8.
41 Tr. Transcript at 95:15-16.
42 *In re Gertsch*, 237 B.R. 160, 167 (9th Cir. B.A.P. 1999) (*quoting In re Houtman*, 568 F.2d 651, 656 (9th Cir. 1978)); *In re Holman*, 536 B.R. 458 (Bankr D. Or. 2015).
43 Tr. Transcript at 21:20-25 - 22:1-10 (Carter testimony).

regarding her employment income.[44] In any case, the state's Exhibits 4 through 6, its overpayment calculations, show that the state paid her more than she was entitled to receive, as discussed in Part III.C.7 below.

### 6. The state's reliance was reasonable.

The types of governmental-benefit payments at issue in this action are intended for people whose other resources are insufficient to support them or their dependents. I heard testimony that the application forms, systems, and policies the state uses to accept and process benefits applications and to seek to recover overpayments are designed to comply with laws, including federal regulations, regulating eligibility for the benefits. Although Maxwell questioned the state's actual reliance on the applications, she didn't offer any evidence or argument that the state's reliance wasn't reasonable. I find that the reliance was at least reasonable.

### 7. Maxwell's debt to the state proximately resulted from her misrepresentations.

The amounts of the debt due from Maxwell to the state were subjects of testimony by Carter and are set forth in the state's Exhibits 4 through 6. According to Exhibit 4, the amount of the SNAP benefits due is $8,813, less the state's recovery of $4,173, leaving a net of $4,650. According to Exhibits 5 and 6, the amounts of the TANF and ERDC benefits due, for which the state has had no recovery, are $2,741.82 and $8,834.60, respectively. Those figures also appear in paragraph 11 of the complaint.[45] The total of the three amounts is $16,216.42. Maxwell offered no evidence to contradict the state's calculations of the overpayment amounts.

The state's Exhibit 7 is its distraint warrant dated December 22, 2106, which includes a $72 fee in addition to the benefits overpayment amounts.[46] The sum of the overpayment amounts and $72 is $16,288.42—the total amount asserted in the complaint.[47] Maxwell offered no evidence or argument that the fee isn't sufficiently related to the remainder of the debt such that the fee should have the same nondischargeable character held by the underlying debt.

I thus find that the state's debt resulted from her application misrepresentations.

### D. *Posttrial briefs*

I received posttrial briefs from both the state[48] and Maxwell.[49] The state's brief addressed the evidence offered at trial and some legal authorities not previously addressed. Maxwell's brief objected to the state's to the extent it "references, identifies, or applies any data, sources, or calculations not already admitted into evidence at trial and contained in the record." Her brief

---

[44] Tr. Transcript at 94:1-11.
[45] Complaint [1] at 3, ¶ 11.
[46] Tr. Ex. 7.
[47] Complaint [1] at 4, ¶ 13.
[48] Docket item 50.
[49] Docket item 52.

didn't identify any facts in the state's brief that were outside the trial record and not so identified by the state. In any case, she didn't in that brief dispute any of the state's brief's calculations or arguments.

## IV.    **Conclusion**

I will prepare and enter a judgment in the state's favor consistent with this letter.

Sincerely,

*David W. Hercher*

DAVID W. HERCHER
Bankruptcy Judge